**Sealed**

Public and unofficial staff access
to this instrument are
prohibited by court order

United States Courts
Southern District of Texas
FILED

*June 18, 2025*

Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Criminal No. **4:25-cr-327** |
| | § | |
| **DERA OGUDO (1),** | § | |
| **VICTORIA MARTINEZ (2), and** | § | |
| **EVELYN SHAW (3)** | § | **UNDER SEAL** |
| | § | |
| | § | |
| **Defendants.** | § | |

**INDICTMENT**

The Grand Jury charges:

**General Allegations**

At times material to this Indictment, unless otherwise specified:

*The Medicare Program*

1.     The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were 65 years or older or disabled. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) that affected commerce.

3.     To enroll in Medicare, all health care providers were required to submit a Medicare enrollment application. In submitting the Medicare application, health care providers certified that they understand and will abide by the federal laws and regulations governing their participation in

Medicare.

4.      When Medicare approved a provider's application, Medicare issued the provider a unique provider number. Upon enrollment, Medicare issued providers a provider manual that describes the requirements to participate in the Medicare program as well as newsletters advising them of any additional requirements for participation and instructions on what services Medicare covers.

5.      CMS contracted with Palmetto Government Benefit Administrators ("Palmetto GBA") to administer Medicare Part A claims in the State of Texas which include claims for hospice services. Each time a provider submits a claim to Medicare, the provider certified that the claim is true, correct, and complete, and complies with all Medicare laws and regulations. The claims are generally submitted electronically.

6.      A provider enrolled as a Medicare provider is able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim is required to set forth, among other things, the beneficiary's name and Medicare HICN, the services that were performed for the beneficiary, the date the services were provided, the cost of the services and the name and identification number of the physician or other health care provider who ordered the services.

7.      Medicare regulations required that a provider document every service rendered to a beneficiary for whom a claim is submitted. This documentation is part of the beneficiary's medical record and is required to be retained by the provider for a period of not less than five years.

*The Medicaid Program*

8.      The Medicaid Program ("Medicaid") was a state-administered health insurance program funded by the United States Government and by Texas. Medicaid helped pay for

2

reasonable and necessary medical procedures and services provided by qualified health care professionals to individuals who were deemed eligible under state low-income programs. Medicaid was implemented in 1967 under the provisions of Title 19 of the Social Security Act of 1965.

9.      Medicaid was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

10.     In order participate in the Medicaid program, a provider must submit an application to the Texas Medicaid and Healthcare Partnership ("TMHP"). If the provider met certain qualifications, TMHP approved the application, entered into a written contract with the provider, and issued a unique provider identification number to the provider. The provider is then allowed to submit bills for services, known as "claims," to Medicaid for reimbursement for the cost of providing medically necessary services to Medicaid clients.

11.     By entering into a contract with Medicaid, a provider agrees to abide by the policies and procedures of the Medicaid program. Medicaid regulations required that a provider document every service rendered to a beneficiary for whom a claim is submitted. This documentation is part of the beneficiary's medical record and is required to be retained by the provider for a period of not less than five years.

## Medicare Coverage of Hospice Care

12.     Medicare was divided into different programs "parts": Part A, Part B, Part C, and Part D. Hospice services were covered under Medicare Part A (hospital-related services).

13.     Section 1861(dd) of the Social Security Act defined "hospice care" as certain items and services provided to a terminally ill individual by a hospice program under a written plan established and periodically reviewed by the individual's attending physician and by the medical

3

director of the hospice program. The services may include doctor and nursing care, certain medical equipment and supplies, certain drugs for pain or symptoms, home health aide services, therapy, social work and counseling, and short-term inpatient stays. Medicare would not pay for treatment to cure the terminal illness under the hospice benefit. Rather, hospice uses medicine, equipment, and supplies to make a patient as comfortable and pain-free as possible.

14.     Medicare reimbursed providers for hospice services provided to a beneficiary only if the beneficiary was terminally ill, as certified by both the beneficiary's attending physician, if the beneficiary had one, and the medical director or a physician member of the hospice's interdisciplinary group ("IDG"). Specifically, they must sign a "Certification of Terminal Illness" certifying the patient is terminally ill and the terminal illness is most likely to result in death of the patient within 6 months if the illness runs its normal course. The attending physician was the physician that the beneficiary identified when he/she elected to receive hospice care as the medical practitioner with the most significant role in the determination and delivery of the beneficiary's medical care. Medicare considered a beneficiary to be "terminally ill" if the beneficiary's life expectancy was six months or less if the beneficiary's illness ran its normal course.

15.     A beneficiary was required to elect to receive hospice services. The beneficiary needed to complete an election form that included an acknowledgement that the beneficiary had been provided a full understanding of hospice care, including the palliative rather than curative nature of treatment, and an acknowledgement that the beneficiary understood that certain Medicare services were waived by the election of hospice care. Once a beneficiary elects to receive hospice services, Medicare will not cover treatment intended to cure the terminal illness and/or related conditions. The beneficiary, once on hospice, waived all rights to Medicare coverage of services to treat or reverse the beneficiary's terminal illness while the beneficiary was on hospice.

4

16.    A beneficiary could elect to receive hospice benefits for two periods of 90 days and, thereafter, additional services for periods of 60 days per period. For the first 90-day period of hospice coverage, the hospice must obtain a physician certification of terminal illness ("CTI"), no later than 2 calendar days after hospice care was initiated, (that is, by the end of the third day). The physician certification, which could be oral or written, must be provided by the medical director of the hospice or the physician member of the hospice interdisciplinary group ("IDG") and the individual's attending physician if the individual has an attending physician.

17.    After the second 90-day period, for the beneficiary to continue to receive reimbursable hospice benefits, Medicare required that a physician re-certify that the beneficiary was terminally ill and include clinical findings or other documentation supporting the diagnosis of terminal illness. For re-certifications, Medicare required a hospice physician or nurse practitioner to meet with the beneficiary in person and conduct a face-to-face evaluation before the CTI is signed by the physician.

18.    The hospice must obtain a written certification of terminal illness for each benefit period, even if a single election continues in effect. A written certification must be on file in the hospice patient's record before any claims could be submitted to the Medicare contractor. Clinical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written certification. Initially, the clinical information may be provided verbally, and must be documented in the medical record and included as part of the hospice's eligibility assessment. The CTI was a statement relied upon by Medicare to ensure the patient is eligible and thus covered for the hospice service. Medicare paid the hospice claims billed by a hospice assuming the statement was accurate.

19.    Hospice entities could provide services in various locations. If the hospice service

was provided in the patient's home, nursing home, or assisted living facility, then it is usually billed as Routine Home Care and referred to as outpatient.

### Relevant Entities, Defendants, and Individuals

20.    United Palliative & Hospice Care ("UPHC") was a hospice facility located at 1811 First Oaks Street, Suite 120, Richmond, Texas 77406. UPHC was enrolled in Medicare and Medicaid.

21.    Cedar Hospice, Inc. ("Cedar Hospice") was a hospice facility located at 12808 W. Airport Boulevard, Sugar Land, Texas 77478. Cedar Hospice was enrolled in Medicare.

22.    Residential Hospice, Inc. ("Residential Hospice") was a hospice facility located at 10401 Mason Road, Suite 104, Richmond, Texas 77406. Residential Hospice was enrolled in Medicare and Medicaid.

23.    Real Comfort Care, LLC ("Real Comfort Care") was a holding company receiving funds from Residential Hospice and Cedar Hospice and located at 10401 Mason Road, Suite 104, Richmond, Texas 77406.

24.    Elizabeth Gardens, LLC ("Elizabeth Gardens") was a group home located at 16614 Boss Gaston Road, Sugar Land, Texas 77498. The named owner of Elizabeth Gardens was a relative of **DERA OGUDO**.

25.    **DERA OGUDO ("OGUDO")** was a resident of Fort Bend County, Texas, within the Southern District of Texas. **OGUDO** was the owner and operator of UPHC. **OGUDO** was a signer on the UPHC business bank account at Chase Bank ending in *2871 ("UPHC Chase Account Ending *2871") into which Medicare and Medicaid reimbursements were electronically deposited. **OGUDO** electronically transferred funds and received deposits from UPHC Chase Account Ending *2871 into her personal Chase Bank account ending in *2922 ("Ogudo Chase

Account Ending *2922") and other accounts. After April 2024, **OGUDO** effectively operated Residential Hospice, Cedar Hospice, and Real Comfort Care.

26.    **OGUDO** was also the operator of group homes, including Elizabeth Gardens, where Medicare and Medicaid beneficiaries resided. These Medicare and Medicaid beneficiaries were enrolled in hospice services with UPHC.

27.    **VICTORIA MARTINEZ** ("**MARTINEZ**") was a resident of Fort Bend County, Texas, within the Southern District of Texas. **MARTINEZ** was employed by UPHC as an administrative assistant and was responsible for patient enrollment and employee scheduling. As of April 2024, **MARTINEZ** was named as an owner on paper for Cedar Hospice, Residential Hospice and Real Comfort Care.

28.    **EVELYN SHAW** ("**SHAW**") was a resident of Harris County, Texas, within the Southern District of Texas. **SHAW** was a discharge planner Psychiatric Hospital 1, a psychiatric hospital in the Houston area, a marketer for UPHC, and received payments for the referral of Medicare and Medicaid beneficiaries from Psychiatric Hospital 1 to UPHC.

29.    Physician 1, a physician licensed in the State of Texas, was employed by UPHC as the medical director.

30.    Group Home Owner 1 was a group home owner who received payments for the referral of Medicare and Medicaid beneficiaries residing in her group home.

31.    Employee 1 was an employee of UPHC and a close associate of **OGUDO** who paid **SHAW** via Cash App for patient referrals.

32.    Individual 1 was a close associate of **OGUDO** and named as an owner on paper for Residential Hospice, Cedar Hospice, and Real Comfort Care.

**<u>The Fraudulent Scheme</u>**

7

*Overview of the Scheme*

33.     The Defendants and their coconspirators engaged in a scheme and artifice to defraud Medicare and Medicaid by submitting and causing to be submitted false and fraudulent claims for medically unnecessary hospice services through UPHC, Residential Hospice, and Cedar Hospice. These hospice services were often medically unnecessary for patients that were never terminally ill, not provided, based on illegal kickbacks and bribes to **SHAW** and other marketers and group home owners, and/or based on illegal kickbacks and bribes to Physician 1. Over the course of the scheme, which began no later than 2019 and continued at least through 2025, UPHC, Residential Hospice and Cedar Hospice billed Medicare and Medicaid over $110 million and were paid over $87 million for hospice services.

*Object and Purpose of the Scheme*

34.     It was an object and purpose of the scheme for the Defendants **DERA OGUDO**, **VICTORIA MARTINEZ**, **EVELYN SHAW** and their coconspirators, known and unknown to the grand jury, to unlawfully enrich themselves by, among other things, pay and receiving illegal kickbacks and bribes and submitting or causing the submission of false and fraudulent claims to Medicare and Medicaid for hospice services that were often medically unnecessary, not provided, based on illegal kickbacks and bribes to **SHAW**, Group Home Owner 1, other marketers and group home owners, and/or Physician 1.

*Executions of the Scheme*

35.     As administrator and owner of UPHC, **OGUDO** oversaw UPHC operations. **MARTINEZ** assisted **OGUDO** and helped manage the day-to-day operations at UPHC.

36.     **OGUDO**, her family members, and her co-conspirators owned and operated several group homes in the Houston area where elderly, disabled, and mentally ill Medicare and Medicaid

beneficiaries lived. **OGUDO** and her co-conspirators preyed on the vulnerable residents of those group homes by enrolling them in hospice services with UPHC (and later Cedar Hospice and Residential Hospice) when they were not terminally ill.

37.     **OGUDO** and **MARTINEZ** increased the census in their hospices by paying kickbacks.  **OGUDO** and **MARTINEZ** solicited referrals of Medicare and Medicaid beneficiaries from individuals like **SHAW** known as "marketers" and group home owners, like Group Home Owner 1, in exchange for illegal kickbacks paid by or at the direction of **OGUDO**. As **OGUDO** and **MARTINEZ** well knew, most of those patients referred by marketers and group home owners had not been referred for hospice by their primary care physicians and were not eligible to receive hospice services covered by Medicare because they were not terminally ill.

38.     On July 25, 2023, **OGUDO** texted a group of UPHC marketers about paying for every referral. **OGUDO** stated, "I pay for every referral I get and still pay you!!!"

39.     At **OGUDO's** direction, marketers also went into assisted living facilities or other locations in and around Houston to make presentations to elderly individuals and obtain patients for UPHC.  In doing so, though, the marketers misled Medicare and Medicaid beneficiaries about the services that UPHC would bill. **OGUDO** would instruct her marketers to tell patients that they would be receiving "palliative" or "home health" services.  **OGUDO** also told marketers that they should specifically not mention that they UPHC was offering only hospice services.  In truth, UPHC would bill hospice services to Medicare and Medicaid.

40.     On October 29, 2019, **OGUDO** texted a group of UPHC employees about the services provided by UPHC. **OGUDO** stated "Good morning team, we provide two services, hospice and palliative care. People are more comfortable to hear palliative care even tho the two services are the almost the same [sic]. Moving forward, pls use palliative care, as it makes them

more comfortable than hospice. Thank you".

41.     In exchange, **OGUDO** would pay marketers and group home owners approximately $500 per patient referral. These payments were made using checks, payroll direct deposit, and Cash App payments sent by Employee 1.

42.     As an example, from September 2022 to August 2024, **OGUDO,** through UPHC, paid **SHAW** $500 to $600 per patient referral via check or Cash App, for a total amount of approximately $72,000. In exchange, **SHAW** referred over 100 Medicare and Medicaid psychiatric patients discharged from Psychiatric Hospital 1 to UPHC for hospice services they did not qualify for. **SHAW** would personally oversee the process of discharging patients and ensure that they were directed to UPHC by passing information along to **MARTINEZ**.  **MARTINEZ** accepted the enrollment information from **SHAW** and enrolled the patients in hospice.

43.     **SHAW** provided shifting explanations of her roles with UPHC.  In employment records obtained from UPHC during the search warrant in January 2024, **SHAW** is listed as a "marketer." However, in an August 21, 2024 interview with investigators, **SHAW** claimed she was a "consultant" with UPHC. In a September 18, 2024 interview, **SHAW** claimed she was paid to transport equipment for UPHC on weekends and after hours. Then, on or about March 25, 2025, **SHAW** produced records claiming that she was a "homemaker" and provided aide services to UPHC patients.

44.     A similar arrangement was in place with Group Home Owner 1.  From December 2020 to January 2024, **OGUDO,** through UPHC, paid Group Home Owner 1  $500 to $600 per patient referral via check for a total amount of approximately over $200,000. In exchange, Marketer 1 referred approximately 40 Medicare and Medicaid beneficiaries, including J.S., many of whom resided in her group home, for hospice services they did not qualify for. **MARTINEZ**

accepted the enrollment information from Marketer 1 and enrolled the patients in hospice. As with **SHAW**, Group Home Owner 1's explanation of her role shifted over time. In employment records obtained from UPHC during the search warrant in January 2024, Group Home Owner 1 is listed as a "marketer". However, in March 2025, Marketer 1 produced records claiming that she was a "Homemaker" for UPHC and provided aide services to UPHC patients.

45.    At **OGUDO**'s direction, UPHC employees exaggerated and falsified patients' medical conditions in medical records to make it seem as though the patients were terminally ill and their health was deteriorating, when in fact they were not.

46.    In addition, **OGUDO** paid kickbacks and bribes to Physician 1 so that Physician 1 would falsely and fraudulently certify and re-certify that patients were terminally ill. Physician 1 was not these patients' treating physician, did not have any face-to-face visits with UPHC patients, and did not review medical records to determine if patients actually qualified for hospice services under Medicare and Medicaid rules and regulations. Physician 1 relied only on fraudulent documentation written by UPHC employees. However, Physician 1 knew this documentation was often false and would exaggerate patients' actual medical conditions and diagnoses. Physician 1 signed certificates of terminal illness for many Medicare and Medicaid beneficiaries because **OGUDO** paid him to do so, not because these patients were actually terminally ill.

47.    In order to conceal that unqualified patients were being admitted at **OGUDO's** direction—rather than based on Physician 1's independent judgment—**OGUDO** and others working at her direction instructed Physician 1 to backdate his signature on the CTIs to make it look as though the certification was completed (and supported the patients' qualifications for hospice services) at the time of the patients' enrollment or reenrollment for hospice services. In truth, those certifications did not occur until after the patients had already been enrolled or

reenrolled in hospice services. These fraudulent certifications did not support hospice admission.

48.     **OGUDO** and **MARTINEZ** were warned in a July 2022 letter that their billing and documentation was improper. At that time, a set of UPHC's claims were reviewed by Qlarant, a Medicare contractor responsible for audits and identifying fraud, waste, and abuse. All of the claims reviewed by Qlarant were denied. **OGUDO** received an education letter following the audit. The education letter identified the claims that were denied, the reasons they were denied, and reminded UPHC of the applicable Medicare requirements for hospice. Nevertheless, **OGUDO** and **MARTINEZ** continued to enroll unqualified patients and bill Medicare for fraudulent hospice services.

49.     In or around January 2024, **OGUDO** and **MARTINEZ** became aware of the criminal investigation into UPHC. In or around April 2024, **OGUDO**, **MARTINEZ**, and others conspired to continue the aforementioned fraudulent scheme using the names of new hospices. They moved dozens of UPHC patients' enrollment to Cedar Hospice and Residential Hospice. Although **OGUDO** effectively controlled and financially benefited from Cedar Hospice and Residential Hospice, **OGUDO** and **MARTINEZ** used **MARTINEZ** and Individual 1 as straw owners to disguise **OGUDO**'s involvement. This was done with the intent to deceive Medicare to ensure that **OGUDO** could continue billing Medicare for hospice services.

50.     Between in or around 2019 and in or around 2025, UPHC, Residential Hospice, and Cedar Hospice billed Medicare and Medicaid approximately $110 million for hospice services for patients who were not terminally ill, not provided, and/or based on illegal kickbacks to marketers, group home owners, and/or Physician 1. Medicare and Medicaid paid approximately $87 million to UPHC, Residential Hospice, and Cedar Hospice based on these fraudulent claims for hospice services.

51.     The proceeds were disbursed to the Defendants, their coconspirators, and others, and the Defendants each personally profited between hundreds of thousands of dollars and tens of millions of dollars from the scheme.

## COUNT ONE
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

52.     Paragraphs 1 through 51 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

53.     Beginning no later than 2019 and continuing through in or around 2025, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, the Defendants,

**DERA OGUDO;**
**VICTORIA MARTINEZ;** and
**EVELYN SHAW**

did knowingly and willfully combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## Object and Purpose of the Conspiracy

54.     The object and purpose of the conspiracy is described in Paragraph 34, and is realleged and incorporated by reference as though set forth fully herein.

13

**Manner and Means of the Conspiracy**

55.     In furtherance of the conspiracy and to accomplish its object and purpose, the manners and means that were used are described in Paragraphs 35 through 51, and are realleged and incorporated by reference as though set forth fully herein.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2-8**
**Health Care Fraud**
**(Violations of 18 U.S.C. §§ 1347 and 2)**

56.     Paragraphs 1 through 51 are re-alleged and incorporated by reference as if fully set forth herein.

57.     Beginning in or around 2019 and continuing through in or around 2025, in the Houston Division of the Southern District of Texas and elsewhere, in connection with the delivery of, and payment for, health care benefits, items, and services, the Defendants did knowingly and willfully execute, and attempt to execute, the aforementioned scheme and artifice to defraud, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of a health care benefit program as defined in 18 U.S.C. § 24(b), that is, Medicare and Medicaid.

58.     On or about the dates specified below, in the Houston Division of the Southern District of Texas and elsewhere, the Defendants specified below, aiding and abetting and aided and abetted by each other and others known and unknown to the Grand Jury, submitted or caused to be submitted the following false and fraudulent claims to the aforementioned health care benefit programs, for hospice services that were often medically unnecessary, not provided, and/or based on kickbacks to marketers, group home owners, and/or Physician 1, in an attempt to execute, and in execution of the aforementioned scheme, as described in Paragraphs 35 through 51, with each

14

execution set forth below forming a separate count:

| Count | Defendant Charged | Approx. Date Claim Received | "Pt." | Hospice | Claim No. | Approx. Amount Paid |
|-------|-------------------|---------------------------|-------|---------|-----------|---------------------|
| 2 | **OGUDO** | 1/5/2021 | J.S. | UPHC | 221005039 81107TXR | $6,076 |
| 3 | **OGUDO** | 3/9/2021 | D.L. | UPHC | 221068021 46107TXR | $3,408 |
| 4 | **OGUDO** | 1/6/2023 | D.R. | UPHC | 223006040 82907TXR | $6,091 |
| 5 | **OGUDO, MARTINEZ,** and **SHAW** | 10/3/2023 | J.B. | UPHC | 223276000 86807TXR | $6,091 |
| 6 | **OGUDO, MARTINEZ,** and **SHAW** | 3/28/2023 | C.K. | UPHC | 223087010 38804TXR | $406 |
| 7 | **OGUDO and MARTINEZ** | 6/6/2024 | M.T. | Residential | 224158039 57407TXR | $5,244 |
| 8 | **OGUDO and MARTINEZ** | 9/4/2024 | M.J. | Cedar | 224248020 20407TXR | $6,386 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

### COUNT 9
**Conspiracy to Defraud the United States and to**
**Pay and Recieve Health Care Kickbacks**
**(Violations of 18 U.S.C. §§ 371 and 2)**

59.     Paragraphs 1 through 51 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

60.     Beginning in or around 2019 and continuing through 2025, in the Houston Division of the Southern District of Texas and elsewhere, the defendants,

**DERA OGUDO;**
**VICTORIA MARTINEZ; and**
**EVELYN SHAW**

did knowingly and willfully combine, conspire, confederate, and agree with others known and

unknown to the Grand Jury, to defraud the United States by impairing, impeding, obstructing and

defeating through deceitful and dishonest means, the lawful government functions of the United

States Department of Health and Human Services in its administration and oversight of Medicare,

and to commit certain offenses against the United States, that is:

a.  to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly
    and willfully soliciting and receiving remuneration, specifically kickbacks and
    bribes, directly and indirectly, overtly and covertly, in cash and in kind in return for
    referring an individual to a person for the furnishing or arranging for the furnishing
    of any item or service for  which payment may be made in whole or in part under a
    Federal health care program, that is, Medicare;

b.  to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly
    and willfully offering and paying remuneration, specifically kickbacks and bribes,
    directly and indirectly, overtly and covertly, in cash and in kind to any person to
    induce such person to refer an individual to a person for the furnishing and
    arranging for the furnishing of any item or service for which payment may be made
    in whole or in part under a Federal health care program, that is, Medicare; and

c.  to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by knowingly
    and willfully offering and paying remuneration, specifically kickbacks and bribes,
    directly and indirectly, overtly and covertly, in cash and in kind to any person to
    induce such person to order any item or service for which payment may be made in
    whole or in part under a Federal health care program, that is, Medicare.

**Purpose of the Conspiracy**

61.    It was a purpose of the conspiracy for the Defendants and their co-conspirators to

unlawfully enrich themselves by paying and receiving kickbacks in exchange for the (1) referral

of Medicare beneficiaries and (2) certification of Medicare beneficaries as terminally ill for whom

UPHC submitted claims to Medicare.

**Manner and Means of the Conspiracy**

16

62.     In furtherance of the conspiracy and to accomplish its object and purpose, the manners and means that were used are described in Paragraphs 35 through 51 are realleged and incorporated by reference as though set forth fully herein.

## Overt Acts

63.     In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Texas, at least one of the following overt acts, among others:

   a.  From in and around July 2019 to in or around January 2024, **OGUDO** paid $305,000 in kickbacks and bribes to Physician 1 to falsely certify that Medicare and Medicaid beneficiaries were eligible for hospice services when they were not. UPHC and **OGUDO** paid Physician 1 approximately $2,000 to $10,000 per month during this time period. OGUDO gradually increased Physician 1's pay as Physician 1 certified and re-certified more and more Medicare and Medicaid beneficiaries for UPHC.

   b.  From in or around September 2019 through in or around September 2024, UPHC and **OGUDO** submitted or caused the submission of claims to Medicare for approximately $59 million in claims for hospice services that were often not medically necessary and/or predicated on the illegal kickbacks to Physician 1. Medicare paid UPHC and Ogudo approximately $42 million on those claims.

   c.  S.G., G.H., L.M., and H.W. were discharged from Psychiatric Hospital 1. On or about March 13, 2023, **MARTINEZ** sent a text message to **SHAW** that S.G., G.H., L.M., and H.W. were all "admitted" and "I have confirmed 4 to [**OGUDO**] Thanks". On or about March 13, 2023, Employee 1 sent $2,000 to **SHAW** for four patient referrals via the Cash App. UPHC billed Medicare for purportedly providing hospice services to S.G., G.H., L.M., and H.W. with a first date of service of on or about March 8, March 11, and March 12, 2023.

   d.  R.B., C.D. and O.E. were discharged from Psychiatric Hospital 1. On or about May 5, 2023, **SHAW** texted **MARTINEZ**, "Did you not get the clinicals for [O.E.]?"  On May 8, 2023, **MARTINEZ** texted **SHAW** "Hello- [**OGUDO**] will be sending for 3 soon." On or about May 8, 2023, Employee 1 sent $1,500 to **SHAW** for three patient referrals via the Cash App. UPHC billed Medicare for purportedly providing hospice services to R.B., C.B. and O.E. with a first date of service of on or about April 29, April 26, and May 7, 2023.

   e.  On or about December 3, 2020, **OGUDO** paid Group Home Owner 1 via check for "6 patient consultation (back pay)". According to UPHC's electronical

medical records, M.H., M.C., S.L., L.B., M.E., and L.S. resided in Group Home Owner 1's group home and the "referral date" is listed as November 3, 2020. UPHC billed Medicare for purportedly providing hospice services to M.H., M.C., S.L., L.B., M.E., and L.S. with a first date of service of on or about November 3 (3 patients) and November 11, 2023 (3 patients).

All in violation of Title 18, United States Code, Section 371.

## COUNTS 10 TO 12
### Payment of Health Care Kickbacks
### (42 U.S.C. § 1320a-7b(b)(2), 18 U.S.C. § 2)

64.    Paragraphs 1 through 51 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

65.    On or about the dates enumerated below, in the Houston Division of the Southern District of Texas, and elsewhere, the defendants set forth below, aiding and abetting and aided and abetted by each other and by others, known and unknown to the Grand Jury, did knowingly and willfully offer and pay remuneration, specifically kickbacks and bribes, directly and indirectly, overtly and covertly, to a person, as set forth below, to induce such person to refer individuals to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare, a Federal healthcare program, in an attempt to execute, and in execution of the scheme described in paragraphs 35 through 51, with each execution set forth below forming a separate count:

| Count | Defendant(s) Charged | Approximate Date | Approximate Amount | Recipient |
|---|---|---|---|---|
| 10 | OGUDO | December 3, 2020 | $3,000 | GROUP HOME OWNER 1 |
| 11 | OGUDO and MARTINEZ | March 13, 2023 | $2,000 | SHAW |

| 12 | **OGUDO** and **MARTINEZ** | May 8, 2023 | $1,500 | SHAW |
|---|---|---|---|---|

## COUNTS 13 TO 14
### Receipt of Health Care Kickbacks
### (42 U.S.C. § 1320a-7b(b)(1), 18 U.S.C. § 2)

66.     Paragraphs 1 through 51 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

67.     On or about the dates enumerated below, in the Houston Division of the Southern District of Texas, and elsewhere, the Defendant

**EVELYN SHAW**

aided and abetted by others, known and unknown to the Grand Jury, did knowingly and willfully solicit and receive remuneration, specifically kickbacks and bribes, directly and indirectly, overtly and covertly, from a person, as set forth below, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare, a Federal healthcare program, in an attempt to execute, and in execution of the scheme described in paragraphs 35 through 51, with each execution set forth below forming a separate count:

| Count | Approximate Date | Approximate Amount | Payor |
|---|---|---|---|
| **13** | March 13, 2023 | $2,000 | **OGUDO** |
| **14** | May 8, 2023 | $1,500 | **OGUDO** |

All in violation of Title 42, United States Code, Section l320a-7b(b)(1) and Title 18, United States Code, Section 2.

19

## COUNTS 15 to 28
### Engaging in a Monetary Transaction in Property Derived from Specified Unlawful Activity
### (Violations of 18 U.S.C. §§ 1957 and 2)

68.    Paragraphs 1 through 51 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

69.    On or about the dates specified below, in the Houston Division of the Southern District of Texas, and elsewhere, the Defendant

## DERA OGUDO

aided and abetted by others, known and unknown to the Grand Jury, did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. § 1349, as follows:

| Count | Approx. Date | Bank Account | Transaction | Approx. Amount |
|---|---|---|---|---|
| 15 | 8/17/2021 | UPHC Chase Account Ending *2871 | Check Deposited into JP Morgan Securities Brokerage Acct Ending *4958 | $500,000 |
| 16 | 8/17/2021 | UPHC Chase Account Ending *2871 | Check Deposited into JP Morgan Securities Brokerage Acct Ending *4959 | $500,000 |
| 17 | 10/4/2021 | UPHC Chase Account Ending *2871 | Check Deposited into JP Morgan Securities Brokerage Acct Ending *9825 | $500,000 |
| 18 | 10/4/2021 | UPHC Chase Account Ending *2871 | Check Deposited into JP Morgan Securities Brokerage Acct Ending *9826 | $500,000 |
| 19 | 11/5/2021 | UPHC Chase Account Ending *0473 | Check Deposited into JP Morgan Securities Brokerage Acct Ending *9825 | $2,000,000 |
| 20 | 11/30/2021 | UPHC Chase Account Ending *2871 | Check Deposited into JP Morgan Securities Brokerage Acct Ending *9826 | $2,000,000 |
| 21 | 8/23/2021 | UPHC Chase Account Ending *2871 | Wire Transfer to Luxury Furniture, Inc. | $20,000 |

| 22 | 11/12/2021 | UPHC Chase Account Ending *2871 | Wire Transfer to Malivelihood Jewelry | $37,000 |
| 23 | 1/29/2022 | UPHC Chase Account Ending *2871 | Purchase at Fiat of Sugarland | $20,000 |
| 24 | 6/22/2020 | Ogudo Chase Account Ending *2922 | Check to Romero Concrete for home remodeling | $37,700 |
| 25 | 11/13/2023 | Ogudo Chase Account Ending *2922 | International Wire Transfer to First Bank of Nigeria | $100,000 |
| 26 | 11/13/2023 | Ogudo Chase Account Ending *2922 | International Wire Transfer to United Bank For Africa LTD, Lagos, Nigeria | $100,000 |
| 27 | 11/8/2021 | Ogudo Chase Account Ending *2922 | Check to Lexus | $42,386.91 |
| 28 | 7/14/2022 | Ogudo Chase Account Ending *2922 | Check to Fish Gallery for Home Aquarium | $45,000 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## NOTICE OF CRIMINAL FORFEITURE
### 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) & 982(a)(7)
### 28 U.S.C. § 2461(c)

70.     Pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(7) and Title 28, United States Code, Section 2461(c), the United States gives notice that upon a defendant's conviction of Counts One through Eight, all property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to such offenses is subject to forfeiture.

71.     Pursuant to Title 18, United States Code, Section 982(a)(7), the United States gives notice that upon a defendant's conviction of Counts Nine through Fourteen, all property, real or personal, which constitutes or is derived from gross proceeds traceable to such offenses is subject to forfeiture.

72.     Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice that upon a defendant's conviction of Counts Fifteen through Twenty-eight, all property,

real or personal, involved in money laundering offenses or traceable to such property is subject to forfeiture.

## **Property Subject to Forfeiture**

73.     The property subject to forfeiture includes, but is not limited to, the following property:

  a.  $270,813.35 seized from JPMC account ending in *2871

  b.  $872,248.65 seized from JPMC account ending in *0473

  c.  $124,940.18 seized from MidFirst account ending in *0172

  d.  $100,865.34 seized from MidFirst account ending in *0180

  e.  $60,332.23 seized from MidFirst account ending in *0390

  f.  $2,807,704.49 seized from MidFirst account ending in *0412

  g.  $10,000.00 seized from MidFirst account ending in *0420

  h.  $196,892.65 seized from MidFirst account ending in *0900

  i.  $122,863.65 seized from MidFirst account ending in *5799

  j.  6418 Anthonia Lane, Richmond, TX

  k.  4525 Avenida Monterrey, Richmond, TX

  l.  21350 FM 529 Road, Cypress, TX

(continued on next page)

## **Money Judgment and Substitute Assets**

74.     The United States gives notice that it will seek a money judgment against each defendant. If one or more conditions listed in Title 21, United States Code, Section 853(p) exist, the United States will seek to forfeit any other property of each defendant up to the amount of the money judgment against that defendant.


                                                        A TRUE BILL

                                                        Original Signature on File
                                                        _____
                                                        FOREPERSON


NICHOLAS J. GANJEI
UNITED STATES ATTORNEY


*Kathryn Olson*
_____
KATHRYN OLSON
BRAD GRAY
ASSISTANT UNITED STATES ATTORNEYS
U.S. ATTORNEY'S OFFICE FOR
THE SOUTHERN DISTRICT OF TEXAS